IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-03158-M

| | | |
|---|---|---|
| MICHAEL ANTHONY JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on the United States' second motion for summary judgment, Mot. [D.E. 75], and defendant Dr. Lawrence Sichel's motion to dismiss and second motion for summary judgment, Mot. [D.E. 77]. For the following reasons, the court grants these motions.

Relevant Procedural History:

On June 8, 2021, Michael Anthony Jones ("plaintiff" or "Jones"), an inmate at F.C.I. Butner ("Butner") proceeding *pro se*, filed a complaint under Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens"), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80. Compl. [D.E. 1]. Plaintiff generally alleges that, from March 8, 2018, to July 24, 2020, Butner physician Lawrence Sichel ("Dr. Sichel") was negligent and violated plaintiff's Eighth Amendment rights by declining to perform diagnostic testing that was recommended by a Rheumatologist which allowed plaintiff's "arterial disease claudication" in his legs to worsen and eventually led to an "ischemia coronary artery heart vasospasm injury [sic]." See id. at 5–7. For relief, plaintiff seeks, *inter alia*, monetary damages. Id. at 8.

On January 24, 2022, the court, *inter alia*, allowed to proceed Bivens claims against Dr. Sichel and related FTCA claims against the United States. See Order [D.E. 10].

On May 31, 2022, Dr. Sichel and the United States (collectively, "defendants") moved for summary judgment, Mot. [D.E. 29], and filed a memorandum in support [D.E. 30], proposed sealed documents [D.E. 31], a proposed sealed exhibit [D.E. 32], a motion to seal documents, Mot. [D.E. 33], and a memorandum in support of the motion to seal [D.E. 34].

Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam) ("Roseboro"), the court notified plaintiff about the motion for summary judgment, the consequences of failing to respond, and the response deadline. [D.E. 35].

On June 21, 2022, plaintiff filed, *inter alia*, a response in opposition. [D.E. 36].

On January 25, 2023, the court, *inter alia*, denied defendants' motions for summary judgment and to seal documents and exhibits. Order [D.E. 45].

On January 31, 2023, plaintiff moved for emergency preliminary injunctive relief. See Mot. [D.E. 47]; Mot. Attach. [D.E. 47-1].

On February 8, 2023, defendants answered the complaint. Answer [D.E. 48].

On March 8, 2023, plaintiff filed interrogatories, a request for production of documents, and a request for admissions, see [D.E. 50, 51], and moved to compel discovery, Mot. [D.E. 52].

On March 21, 2023, defendants filed a response in opposition to plaintiff's motion to compel. Defs.' Resp. [D.E. 53].

On March 29, 2023, the court denied plaintiff's motions for injunctive relief and to compel discovery. Order [D.E. 54].

On April 12, 2023, plaintiff moved for leave to amend his complaint, Mot. [D.E. 55], and filed a memorandum [D.E. 55-1], a verified amended complaint, [D.E. 55-2] (refining prior Bivens and FTCA claims against defendants, adding new claims as to medical treatment by Dr. Christopher Longo, and seeking, *inter alia*, money damages), and exhibits in support [D.E. 55-3].

2

On June 2, 2023, the court granted in part and denied in part the motion for leave to amend, dismissed without prejudice plaintiff's newly raised claims against Dr. Longo, directed defendants to answer relevant portions of the verified amended complaint, and stayed deadlines pending the entry of a new scheduling order. See Order [D.E. 60].

On June 16, 2023, defendants answered the amended complaint. [D.E. 62].

On June 20, 2023, the court entered a scheduling order with a discovery deadline of September 18, 2023, and a motions deadline of October 18, 2023. Order [D.E. 63].

On July 17, 2023, plaintiff filed a motion for a temporary restraining order ("TRO") and preliminary injunction, Mot. [D.E. 64], and a declaration in support, Pl.'s Decl. [D.E. 64-1].

On September 21, 2023, plaintiff moved to compel discovery. Mot. [D.E. 72].

On October 5, 2023, defendants filed a response in opposition to plaintiff's motion to compel discovery. Defs.' Resp. [D.E. 74].

On October 18, 2023, the United States filed a second motion for summary judgment, Mot. [D.E. 75], with a memorandum in support [D.E. 76], and Dr. Sichel filed a motion to dismiss and second motion for summary judgment, Mot. [D.E. 77], together with a memorandum in support [D.E. 78], a statement of material facts [D.E. 79], and an appendix [D.E. 80]. Pursuant to Roseboro, 528 F.2d at 310, the court notified plaintiff about these motions, the consequences of failing to respond, and the response deadline [D.E. 81, 82].

On October 23, 2023, the court denied both plaintiff's motion for a TRO and preliminary injunction and his motion to compel discovery. See Order [D.E. 83].

On November 9, 2023, plaintiff filed a response in opposition to defendants' dispositive motions, self-styled as a "Declaration, memorandum, and appendix in opposition to defendants' motion for summary judgment [sic]." See Pl.'s Resp. [D.E. 87].

3

As noted below, the facts are somewhat disputed. Dr. Sichel has been one of plaintiff's primary care providers at Butner since 2017.[1] Defs.' Stmt. Mat. Facts [D.E. 79] at ¶¶1–2.

Plaintiff "has a history of multiple conditions, including Raynaud's syndrome,[2] hypertension, joint pain (in his knee and shoulder), Mixed connective tissue disease, Interstitial lung disease, and Chronic Kidney Disease," and "is routinely seen in Chronic Care Clinic for his Rheumatology and Gastrointestinal conditions, as well as his hypertension."[3] Id. at ¶3.

Circa April 27, 2017, Dr. Sichel ordered a high-resolution chest CT scan of plaintiff. See Am. Compl. [D.E. 55-2] at 3, ¶11; Am. Compl. Attach., Ex. A [D.E. 55-3] at 1 (Apr. 27, 2017, radiologic report by Randy A. Cruell, M.D., noting: as to "reasons for study/provisional diagnosis by referring clinician," "pulmonologist request high-resolution chest CT scan to evaluate interstitial lung disease" and that plaintiff "has mixed connective tissue disease" and "possible pulmonary hypertension"; as to findings, "negative for mediastinal mass or significant lymphadenopathy. Mild atherosclerotic calcifications in the aorta. Negative for aggressive bony lesions"; as to "impressions," "1. Areas of honeycombing notes as may be seen with pulmonary fibrosis. Negative for pulmonary consolidation or focal mass  2.  Bronchiectasis noted bilaterally primarily in the lower lobes 3. Underlying bullous emphysematous changes suspected 4. Negative

---

[1] See Defs.' App., Sichel Decl. [D.E. 80-1] at ¶3 (declaring, at Butner, Dr. Sichel: evaluates and develops plans to meet patient total health care needs; makes decisions as to patient medical needs, in coordination with the supervising physician; prescribes medications and treatment for illness; is the primary provider for routine requests for evaluation of new complaints, for routine recurring visits for chronic illness, and for emergencies when clinically indicated; and establishes diagnostic impressions and requests appropriate diagnostic tests based upon patient needs).

[2] See Defs.' App., Sichel Decl. [D.E. 80-1] at ¶8 (declaring: "Raynaud's syndrome is a condition that causes decreased blood flow to the fingers, and in some cases, to the ears, toes, knees, and nose," and "can occur on its own" or "be caused by numerous other conditions, including connective tissue disorders (such as Lupus or rheumatoid arthritis), or various medications including those prescribed to treat high blood pressure (such as beta-blockers).").

[3] See Defs.' App., Sichel Decl. [D.E. 80-1] at ¶98 (declaring: at Butner, plaintiff "has been followed regularly not only by his primary care provider team, but also several specialty care providers including Rheumatology, Pulmonology, Gastroenterology, Physical Therapy, Pain Management/Physiatry, Neurosurgery and Colorectal Surgery.").

for mediastinal mass or significant lymphadenopathy"; as to "addendum," "Pulmonary trunk borderline dilated at approximately 3.3 cm in diameter. This could relate to pulmonary arterial hypertension in appropriate clinical setting.").[4]

On February 7, 2018, plaintiff sent an electronic message directed to Dr. Sichel. See Am. Compl. [D.E. 55-2] at 3, ¶12; Am. Compl. Attach., Ex. B [D.E. 55-3] at 1 (stating: "The medicine you gave me for pain – aspirin and – ibuprofen doesn't work – the muscle pain is coming more severe since the bacifen [sic] only calm it down[,] it [doesn't] stop the pain after the muscle spasms come and past [through.] I need some stronger pain medicine than what you [are] providing me [sic]."); id. (Health Services Assistant K. Woodley's response: "Your provider has changed your Baclofen to a higher dose for your muscle spasms. Please continue to follow the plan of care outlined by your provider and report to sick call if you[] feel your condition has worsened.").

On March 9, 2018, a Rheumatologist, *inter alia*: assessed "pulmonary fibrosis possibly related to mixed connective tissue disorder and Raynaud's"; noted "a prior recommendation (by Pulmonology) to increase methotrexate is valid, but his pulmonary fibrosis may be exacerbated"; "recommended increasing the methotrexate and increasing a calcium supplement, to control muscle cramps due to calcium loss from high dose prednisone use"; recommended rechecking lab work for autoimmune disease; and noted "Vascular studies may be considered to rule out any underlying arterial disease [he] may have which might be giving him claudication and muscle cramps in the legs." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶5; see Defs.' App. [D.E. 80-2] at 1–2

_____

[4] Compare Am. Compl. [D.E. 55-2] at ¶11 (alleging that, despite an April 27, 2017, radiology report noting "Mild atherosclerotic calcifications in the aorta," and his "complaints concerning his deteriorating condition, [Dr.] Sichel chose to ignore further testing or treatment requests by specialists in the face of worsening signs and symptoms beyond this diagnosis."), with Defs.' App., Sichel Decl. [D.E. 80-1] at ¶ 101 (declaring that, although plaintiff "alleges harm from mild atherosclerotic calcifications in the aorta, as reported on a CT scan from April 27, 2017," Dr. Sichel's "review of his medical records indicates that at the time, [he] was receiving medications to lower his blood pressure" that "would also help to reduce progression of atherosclerosis," he currently "is on cholesterol lowering medication that also can retard the clogging of the arteries," and there "is no evidence of harm from the calcifications.").

5

(Mar. 9, 2018, Ajay Ajmani, M.D., consultation report noting, *inter alia*: as major complaint, "muscle cramps in the legs and arms, otherwise, normal" with "no joint swellings" and "minimal shortness of breath."; as the "plan," acknowledging a "suggestion by pulmonology to increase methotrexate is valid and as a steroid-sparing agent. However, due to pulmonary fibrosis, it may be exacerbated by increasing methotrexate beyond the limit [sic]"; stating, "we may try increasing the methotrexate . . . and increase calcium supplement for his muscle cramps due to calcium loss from high dose prednisone use"; suggesting "a trial of prednisone taper may be undertaken under pulmonology guidance and lung functions" and "Also, consideration for sildenafil for pulmonary fibrosis may be considered"; recommending rechecking lab work "for autoimmune disease including antinuclear antibody, extractable nuclear antibodies (ANA, ENA, and ANCA, antineutrophil antibodies, sed rate, including CK and aldolase to see if there is any underlying muscle disease which might be giving him muscle spasms"; and stating, "Vascular studies may be considered to rule out any underlying arterial disease he may have which might be giving him claudication and muscle cramps in the legs."). Dr. Sichel reviewed this consultation report on April 16, 2018. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶5; see Defs.' App. [D.E. 80-2] at 3.

On April 16, 2018, at sick call, plaintiff "voiced complaints of continued muscle spasms" and requested a reduction in his "dose of Baclofen (which had been prescribed to help control the spasms)." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶6. Dr. Sichel: found "normal temporal artery pulsations, no lower extremity edema (swelling), and [that he] was able to sit up quickly from a supine position without problem"; "noted that the Rheumatologist had recommended increasing [his] prescribed methotrexate sodium and calcium, in an effort to control the muscle spasms"; "reduced [his] Baclofen prescription to 10 mg three times per day, and also reduced [the] prednisone dose as the Pulmonology and Rheumatology specialists had recommended"; and

6

"noted that [his] lower extremity pulses were strong, which means that he is unlikely to have peripheral vascular disease."[5] Id.; see Defs.' App. [D.E. 80-2] at 4–8 (Apr. 16, 2018, encounter).

On May 21, 2018, at sick call: plaintiff complained of abdomen swelling; the nurse noted he was not in distress, had no shortness of breath, and had no signs of pain; and he was informed he was scheduled for an appointment with Dr. Sichel. See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶7; accord Defs.' App. [D.E. 80-2] at 9–10 (May 21, 2018, clinical encounter with Chad Carter, RN).

On June 13, 2018, plaintiff had a sick call visit. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶8; see Defs.' App. [D.E. 80-2] at 11–13 (reflecting, *inter alia*: complaint of abdominal swelling and "severe abdominal pain," and statements that "he needed a paracentesis and an upper endoscopy" and stronger pain medication; Dr. Sichel's exam noting lower left quadrant abdomen tenderness, with no rebound or signs of ascites, and lower extremity edema; requesting a Rheumatologist follow-up after recent requested lab work; Dr. Sichel's reiteration, "Lower extremity pulses strong so unlikely to have Peripheral Vascular Disease"; Dr. Sichel's notation, as a provisional diagnosis, "Mixed connective Tissue Disease"; Dr. Sichel's explanations to plaintiff "there is no evidence on exam for fluid in abdomen that would require drainage," that "Acetaminophen [was the] only safe choice for pain available" as "NSAID can worsen blood pressure and fluid retention" and they "want to avoid narcotics"; that Dr. Sichel did "not see any indication for upper endoscopy"; and Dr. Sichel's prescription of "a low dose diuretic again to improve blood pressure and edema").

On July 13, 2018, at a follow-up, the Rheumatologist: noted abdominal pain and a gastroenterology workup may be considered; recommended discontinuing methotrexate due to slight elevation of liver enzymes; noted Raynaud's syndrome "may explain his intermittent

---

[5] Compare Am. Compl. [D.E. 55-2] at 4, ¶14 (alleging, although Dr. Ajmani recommended vascular studies to screen for possible arterial disease, Dr. Sichel "pre-diagnosed" him as "unlikely to have Peripheral Vascular Disease" due to strong pulses in his lower extremities), with Defs.' App., Sichel Decl. [D.E. 80-1] at ¶10 (declaring: "I also noted that plaintiff's lower extremity pulses were strong, which means he is unlikely to have peripheral vascular disease").

7

claudication of lower extremities" but "None the less, vascular studies are recommended to rule

out any permanent fix lesion in any of his blood vessels, even though the pulses are present"; and

recommended follow-up on an as-needed basis. See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶9; see

Defs.' App. [D.E. 80-2] at 14–15 (July 13, 2018, Consultation Report with Dr. Ajmani). Dr. Sichel

reviewed this consultation report on August 17, 2018. Defs.' App. [D.E. 80-2] at 16.

On July 16, 2018, at a follow-up encounter: plaintiff "complained of persistent abdominal

distention, and reported pain when he laid on his stomach, also making it harder for him to

[breathe]." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶10. Dr. Sichel: noted "his abdomen protruded

when standing, and he had tenderness diffusely, though not when the stethoscope was used to exert

pressure"; prescribed medication to treat constipation; renewed "various prescriptions"; and, as

recommended by the Rheumatologist, stopped methotrexate "due to elevated liver enzymes." Id.;

accord Defs.' App. [D.E. 80-2] at 17–19 (July 16, 2018, Dr. Sichel clinical encounter).

On August 28, 2018, at sick call, plaintiff "requested a medical mattress because of his

muscle disorder" and "stated he had been having spasms in his upper back and back of left arm,

as well as his hands." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶11. Dr. Sichel: noted it did not make

sense to perform vascular studies;[6] informed plaintiff about "the plan of care, which included a

_____

[6] Compare Defs.' App., Sichel Decl. [D.E. 80-1] at ¶¶15, 99 (declaring: "I noted that because [he] was having spasms all over his body, at the time it did not make sense to perform vascular studies of his lower extremities, as recommended by the Rheumatologist"; and, "Throughout the course of [Dr. Sichel's] treatment of [plaintiff], he has routinely had very strong pulses in his feet, which would make a fixed lesion in the arteries to his feet very unlikely. As such, [Dr. Sichel] disagreed with the consulting Rheumatologist's recommendations in 2018, for vascular studies of the arteries of [his] lower extremities"), with Am. Compl. [D.E. 55-2] at ¶15 (alleging: Dr. Sichel "substituted [his] own judgment in place of the rheumatologist's recommendations"; "Upon information and belief, [he] became a victim of a diagnosis power struggle between Dr. Sichel, a general practitioner, and Dr. Ajmani, a certified specialist"; and he "ultimately paid the price for Sichel's obstinacy"), and Pl.'s Resp. [D.E. 87] at 9–11, ¶¶2–3 (arguing, *inter alia*: Dr. Sichel was "made aware of [his] condition and the specialist's recommendations for further studies to rule out progression of the disease" but "failed to follow these recommendations, placing [his] life in danger"; Dr. Sichel "is under the impression that merely because a pulse is present in the extremities (the legs or arms) that the disease does not need to be further tested. This is a problem with a general practitioner's limited knowledge in the venal field of medicine [sic] believing his non-specialist opinion should outweigh a specialist's opinion"; and Dr. Sichel's justification for not following the Rheumatologist's recommendations was "illogical" as he "was experiencing spasms related to his diagnosis of atherosclerotic calcifications throughout his body including his lower extremities [sic]").

8

consultation request for lung function testing, and follow up with the Pulmonologist"; and told plaintiff he did not meet the criteria for a medical mattress. Id.; see Defs.' App. [D.E. 80-2] at 20–22 (Aug. 28, 2018, Dr. Sichel clinical encounter).

On September 4, 2018, at sick call, plaintiff asked, "to see the Rheumatologist due to the frequency in his spasms" and "to see a Pulmonologist for his breathing issues." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶12. The nurse noted normal vital signs and told him consultation requests were pending. Id.; accord Defs.' App. [D.E. 80-2] at 23–24 (Sept. 4, 2018, nurse clinical encounter).

Circa October 3, 2018, plaintiff sent an electronic message to Dr. Sichel "concerning painful hand spasms with signs of muscular deformity showing on the cramped hand." Am. Compl. [D.E. 55-2] at 5, ¶16; see Compl. Attach., Ex. D [D.E. 1-2] at 10 (plaintiff's message: "MD – Sichel I need to see a Rheumatologist on my hand and muscle spasms – my hand be going deform when I pick up papers and I be losing feeling something serious is going on with my body [sic]"); id. (Oct. 3, 2018, response: "You were seen by Dr. Sichel on 8/28/18. You have a follow-scheduled with him this month; however, if your condition worsens[,] please report to sick call.").

On November 1, 2018, at an encounter, plaintiff "complained of continued muscle spasms with numbing sensation in his hands and lower legs, with repetitive movement," noted "taking one Baclofen per day helped," and "continued to complain of abdominal distention." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶13. Dr. Sichel had him "pick up books repetitively for just under five minutes, and noted that his index finger turned dark, but no muscle spasms occurred." Id. Dr. Sichel: noted "mild lower extremity edema," and his "Raynaud's syndrome was triggered by repetitive use (as with the picking up books, and his index finger coloration)"; reviewed and continued medications; ordered laboratory testing and "a cervical x-ray (due to right posterior neck pain for one month)"; noted his liver enzymes "had improved with the cessation of the methotrexate"; and informed him

9

"he was already receiving the treatments available for muscle spasms and abdominal symptoms." Id.; see Defs.' App. [D.E. 80-2] at 26–28 (Nov. 1, 2018, clinical encounter).

On December 20, 2018, at a sick call, plaintiff complained of "swelling and pain in his right knee" and "reported his pain had resolved and the swelling had gone down." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶14. Dr. Sichel noted "some inflammation inferior to the right patella, but no effusion (fluid accumulation) or tenderness," and "determined no further care was necessary for this issue." Id.; accord Defs.' App. [D.E. 80-2] at 29–30 (Dec. 20, 2018, clinical encounter).

On January 10, 2019, plaintiff "had Pulmonary Function studies done which showed [ ] no obstructive lung defect, a moderate restrictive lung defect, and a moderate decrease in diffusing capacity (poor absorption of gases by lung tissue)." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶15; accord Defs.' App. [D.E. 80-2] at 31 (Jan. 10, 2019, Spirometry data signed by Dr. Ashish Singh).

On January 18, 2019, "Dr. Sichel saw [plaintiff] for his preventive health care visit, as well as his Chronic Care Clinic encounter."[7] Defs.' Stmt. Mat. Facts [D.E. 79] at ¶16; see Defs.' App. [D.E. 80-2] at 33–34 (Jan. 18, 2019, clinical encounter).

Circa February 11, 2019, plaintiff sent an electronic message directed to Dr. Sichel "complaining of extreme pain in the right leg [sic]." Am. Compl. [D.E. 55-2] at 5, ¶17; Compl. Attach., Ex. E [D.E. 1-2] at 11 (stating: "Dr. Sichel[,] I [brought] this to your attention before. I

---

[7] Compare Defs.' App., Sichel Decl. [D.E. 80-1] at ¶20 (declaring: Plaintiff "reported complaints of severe pain in his hands that lasted two minutes and that was not alleviated with the use of acetaminophen"; he "reported taking one Baclofen tablet per day to help with muscle spasms"; he "was observed to have some lower extremity edema, and his finger joints were not tender"; his "various medications were renewed, and an ultrasound of his kidneys was ordered due to an increased creatine level"; Dr. Sichel "entered consultation request for him to be seen by: 1) Pulmonology, for follow-up of his interstitial lung disease secondary to mixed connective tissue disease, and 2) Pharmacy's Pain Management Clinic, for management of his severe joint pain"; Dr. Sichel "again educated [him] that he cannot use medications such as naproxen or ibuprofen, as they can worsen his kidney disease"; and "the plan was for [him] to follow-up with the Pulmonologist, and then return to the Rheumatologist"), with Pl.'s Resp. [D.E. 87] at 11, ¶4 (arguing, inter alia: a preventative health care visit is a yearly routine check-up for all 600 Butner inmates; "Edema is basically excess watery fluid collecting in the cavities inside tissue of the body"; "The edema means that [his] condition is worsening and [Dr.] Sichel admits he is aware of this progression, and yet Sichel still refuses to abide by specialist recommendations for further testing to determine the level of deterioration of [his] worsening condition.").

need to get inflammation drain from my right leg. It's hurting me [badly] and it's very painful. Dr. Watson[,] a rheumatologist[,] was treating me and was doing this procedure when I was free before I came to prison in managing my mixed tissue disorders. She would take a [needle] and place it in my right bottom leg and go into the bone[,] and the inflammation that come out would be yellow once she [drained it]. I need to get this done[;] my right leg is hurting bad. I can feel it when I walk"); id., (with a response, "This has been forward[ed] to your physician.").

On March 11, 2019, in the Pain Management Clinic ("PMC"), the Pharmacist reviewed plaintiff's "various conditions and complaints of pain." See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶17. Plaintiff "was observed to come into the office with a normal gait" and "was in no apparent distress during the interview." Id. Plaintiff "complained of worsening pain due to his 'Lupus.'" Id. "The Pharmacist prescribed oxcarbazepine for treatment of cervicalgia (neck pain)" and "renewed his prescriptions for acetaminophen and Baclofen." Id.; accord Defs.' App. [D.E. 80-2] at 35–37 (Mar. 11, 2019, PMC clinical encounter with Epiphanis Iregbu, PharmD).

On March 20, 2019, at sick call, plaintiff complained of right knee instability, stating "he previously had fluid removed from his knee and he thought this needed to be done again." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶18. Dr. Sichel: noted the knee was not tender upon palpation; told plaintiff there "was no fluid that Dr. Sichel could detect that would prompt consideration of removal" and "with a joint aspiration, there is risk of infection"; and noted he "appeared to have excess synovial tissue at the knees, which was likely from his underlying inflammatory condition." Id.; accord Defs.' App. [D.E. 80-2] at 39–40 (Mar. 20, 2019, Dr. Sichel clinical encounter).

On April 25, 2019, plaintiff was seen by the Pulmonologist who "noted that [he] had interstitial lung disease secondary to connective tissue disease with a decline in pulmonary function tests since the prior visit," and recommended that he "be started on Mycophenolate, and

11

then reduce the prednisone dose after one month." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶19. Dr. Sichel, on May 13, 2019, entered both the Pulmonologist's order and a consultation request for a Pulmonologist follow-up after two months. Id.; accord Defs.' App. [D.E. 80-2] at 41, 42.

On May 15, 2019, Dr. Sichel entered an order to discontinue plaintiff's "prescription for oxcarbazepine, which had been prescribed for treatment of his severe joint pain," due to plaintiff's "poor compliance with taking the medication, which indicated he did not want this medication for pain." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶20; accord Defs.' App. [D.E. 80-2] at 43–44.

Also on May 15, 2019, after Dr. Sichel "ordered another CT-chest x-ray scan [sic] . . . due to [his] numerous complaints of pain and deteriorating health problems [sic]," a "radiologic report diagnostic test again showed an active disease in progress and found [his] 'thoracic aorta is mildly tortuous and mildly atherosclerotic.'" Am. Compl. [D.E. 55-2] at 5, ¶18; see Am. Compl. Attach., Ex. H [D.E. 55-3] at 10 (May 15, 2019, radiologic report by Randy A. Cruell, M.D., noting: as the reason for referral, "follow-up to interstitial lung disease"; as to "technique," "front and lateral views of chest"; as to "comparison," 02/27/2017; as to "findings/impression," "Mild diffuse pulmonary scarring similar to prior. Pulmonary hyperaeration. Subtle superimposed acute pulmonary process may be obscured. Negative for focal pulmonary consolidation. Heart size appears stable. Thoracic aorta is mildly tortuous. Bony structures appear stable. No significant interval change. Negative for definite acute process.").

On June 14, 2019, plaintiff had a follow-up encounter for, *inter alia*: complaints "of painful skin lesions on his lower legs"; a request for "the ability to get pain medication from pill line (i.e., dispensed by staff, as opposed to being maintained in his possession), on an as needed basis"; a report of "pain in his lower abdomen when he lays flat, and continued problems with constipation"; and a request for "a wheelchair and to be pushed up to the medical clinic because he gets short of

breath." See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶21. Dr. Sichel: "noted that the Pulmonologist had recommended a reduction in his prednisone dose"; reduced the prednisone dose and renewed other medications; "observed hyperpigmented patches on the front of his lower shins, including a scab on his left shin, and a dark papule (pimple) on his upper left leg"; "noted the anterior lower leg lesions may be secondary to his autoimmune disease"; "entered a consultation request for him to be evaluated by Dermatology, for management of the painful skin lesions on his lower legs"; requested a Physical Therapy evaluation "to see if a wheelchair was warranted, due to his complaints of shortness of breath when walking"; as to pain medication requests, "educated him that narcotics are not a good solution for his chronic pain issues, and that he was already being followed by the Pain Clinic"; and "advised [him] that it was better for him to try to continue to walk, rather than become dependent on a wheelchair" despite his insistence "on his need for a wheelchair."[8] Id.; accord Defs.' App. [D.E. 80-2] at 45–48 (June 14, 2019, clinical encounter).

On June 21, 2019, the Physical Therapist reviewed plaintiff's case, and determined that at that time, issuance of a wheelchair was not warranted. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶22; accord Defs.' App. [D.E. 80-2] at 49 (June 21, 2019, administrative note by C. Wharton, MPT).

On July 3, 2019, at the PMC, plaintiff reported "he was still in pain," "it worsened when his disease flared up," and further "reported pain in his neck, shoulder, knees (right more than the left), and legs." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶23. The Pharmacist: observed he walked into the office with a normal gait and was in no apparent distress; increased the acetaminophen prescription to help with pain during flare ups; renewed the prednisone prescription; and "released" him from the PMC "as the Pharmacist was unsure if he would benefit from the continued

---

[8] Compare Pl.'s Resp. [D.E. 87] at 11, ¶5 (arguing hyperpigmentation is "likely the symptoms of [his] diagnosis for venal disease into a new direction for an undiagnosed skin condition," but Dr. Sichel still refused to follow specialist recommendations for further testing "to determine the extent of [his] venal disease"), with Defs.' App., Sichel Decl. [D.E. 80-1] at ¶25 (declaring he "noted the anterior lower leg lesions may be secondary to his autoimmune disease").

management by the PMC, as his pain was only intermittent with disease flare up." Id.; accord
Defs.' App. [D.E. 80-2] at 50–52 (July 3, 2019, Epiphanis Iregbu, PharmD, PMC encounter).

On July 10, 2019, plaintiff had a follow up with the Pulmonologist. Defs.' Stmt. Mat. Facts
[D.E. 79] at ¶24; accord Defs.' App. [D.E. 80-2] at 54 (July 10, 2019, consultation report with
Stephen Tilley, M.D., recommending, *inter alia*: increase of Mycophenolate and subsequent
reduction of Prednisone; follow-up for chest x-ray, spirometry, and diffusion; and a referral to
rheumatology for joint disease and dermatology for bilateral hyperpigmented rash over shins).

On July 17, 2019, at sick call, plaintiff complained of "worsening skin lesions on his leg
(without pain), and painful muscle spasms at night." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶25. Dr.
Sichel: examined him; noted "anterior lower leg lesions may be secondary do autoimmune
disease" and that he "had a pending dermatologist consultation"; reviewed Pulmonologist and
Rheumatologist consultation notes; entered the recommended Respiratory Therapy consultation
request; updated his Mycophenolate prescription, as recommended by the Pulmonologist; and
noted "the Rheumatologist recommended vascular studies" which he did not feel were necessary
or helpful at the time.[9] Id.; accord Defs.' App. [D.E. 80-2] at 56–58 (July 17, 2019, encounter).

On August 13, 2019, plaintiff was seen for testing. Defs.' Stmt. Mat. Facts [D.E. 79] at
¶26; accord Defs.' App. [D.E. 80-2] at 59 (Aug. 13, 2019, Spirometry data by Ashish Singh, M.D.).

On August 16, 2019, Dr. Sichel reduced plaintiff's Prednisone dose, as recommended by
the Pulmonologist. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶27; accord Defs.' App. [D.E. 80-2] at 61.

---

[9] Compare Defs.' App., Sichel Decl. [D.E. 80-1] at ¶29 (declaring, "based upon [his] knowledge of [plaintiff's]
condition and history, [Dr. Sichel] did not feel the [Rheumatologist recommended vascular] studies were necessary,
or would be helpful, at that time."), with Am. Compl. [D.E. 55-2] at 5, ¶19 (alleging: on July 17, 2019, Dr. Sichel
"wrote a report again countermanding Dr. Ajmani's recommendations," and Dr. Sichel's "decision left [him] to suffer
without remedy for painful muscular spasms, long-lasting cramps, and a debilitating loss of body functions"), and
Pl.'s Resp. [D.E. 87] at 12, ¶6 (arguing, *inter alia*: "Dr. Sichel again parts ways with the specialists' recommendation
based on his 'knowledge' of the disease"; Dr. Sichel "is aware" of his "worsening pain and suffering" but "will not
concede to those who have trained far more" in vascular medicine; and, "with such vascular studies conducted, the
full extent of [his] condition could be fully known," but "he continues to deny that basic standard of care [sic].").

14

On September 9, 2019, plaintiff was seen by the Dermatologist. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶28; accord Defs.' App. [D.E. 80-2] at 62 (Sept. 9, 2019, consultation report by Philip Meador, M.D., with impressions of, *inter alia*: "post inflammatory hyperpigmentation of the legs, nonspecific today with no primary lesions noted"; "consider secondary to old trauma"; "consider diabetic dermatopathy"; and "consider healed old LE sites or other.").

On September 27, 2019, plaintiff was evaluated by the Gastroenterologist. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶28; accord Defs.' App. [D.E. 80-2] at 64 (Sept. 27, 2019, consultation report by Mark Dubinski, M.D., assessing, *inter alia*, "probable chronic idiopathic constipation").

On October 8, 2019, Dr. Sichel: reviewed plaintiff's September 2019 gastroenterologist and dermatologist consultation notes; noted "the Dermatologist did not see any primary lesions on his legs, but did request follow up in a few months for a separate, unrelated issue"; entered a dermatology follow-up consultation request; and entered consultation request for the colonoscopy recommended by the Gastroenterologist. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶29; accord Defs.' App. [D.E. 80-2] at 66 (Oct. 8, 2019, consultation report review encounter).

On October 16, 2019, Dr. Sichel reviewed the August 2019, Pulmonologist consultation notes and, because plaintiff "had been on the higher dose of Mycophenolate for three months," entered the recommended request for a repeat chest x-ray, and entered a Respiratory Therapy request for the recommended spirometry. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶30; accord Defs.' App. [D.E. 80-2] at 67 (Oct. 16, 2019, consultation report review encounter).

On October 23, 2019, a radiologic report found a "mildly tortuous aorta." Am. Compl. [D.E. 55-2] at 5–6, ¶20; Am. Compl. Attach, Ex. J [D.E. 55-3] at 12 (Andrew I. Choi, M.D., "PA and lateral chest" report noting: as "comparison," "5/15/2019 and 2/27/2017 chest x-ray, Chest CT 04/27/2017"; as "findings," "lungs are mildly hyperinflated. Cardiac silhouette normal size.

15

Mildly tortious aorta. Mediastinum and hila remain stable. Mild left perihilar opacities remain stable. Slight increase in right perihilar opacities, which could represent progression of interstitial lung disease and prominence of central vasculature and mild peribronchial cuffing. Prominent interstitial opacities, predominately in the lower lobes, otherwise similar in pattern to the previous exam. Two adjacent nodular densities in the right lower lung overlie the seventh right anterior rib. This may represent prominent vessels on end or focal areas of bronchial wall thickening. Follow-up films recommended. No other significant interval changes. No pleural effusions seen. Degenerative changes in the spine"; as "impression," "1. Slight interval increase in right perihilar opacities, which could represent progressive interstitial lung disease in the absence of suspected acute pneumonitis, 2. Two immediately adjacent nodular densities with combined measurements of 3 x 7 mm overlie the right lung base at the level of the right anterior seventh rib . . . Given the possibility of inflammatory nodules, vessels on end, etc. follow-up films in two to three weeks are recommended to verify return to baseline. If findings persist, a CT scan may be required.").

On November 14, 2019, plaintiff "was seen for testing." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶31; accord Defs.' App. [D.E. 80-2] at 59 (Nov. 14, 2019, Spirometry data by Dr. Ashish Singh).

On November 19, 2019, at sick call, plaintiff complained about hypertension medication and intermittent lower abdominal pain. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶32. Dr. Sichel: reviewed the Gastroenterologist's recommendations and chest x-ray findings; made minor adjustments to prescribed medications; and entered a request for a repeat chest x-ray based upon the Pulmonologist's recommendation to evaluate nodules seen in his right lung base. Id.; accord Defs.' App. [D.E. 80-2] at 70–72 (Nov. 19, 2019, clinical encounter with Dr. Sichel).

On December 18, 2019, Dr. Sichel: reviewed the report from plaintiff's November 20, 2019, repeat chest x-ray, noted right lung nodules were less prominent, and entered the

16

recommended an order for a repeat chest x-ray. See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶33; accord Defs.' App. [D.E. 80-2] at 70–72 (Dec. 18, 2019, review note by Dr. Sichel).

On December 19, 2019, Dr. Sichel reviewed a pulmonary function test report and entered a consultation request for a follow up evaluation with the Pulmonologist. See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶34; see Defs.' App. [D.E. 80-2] at 74 (Dec. 19, 2019, Dr. Sichel review note).

On January 10, 2020: plaintiff reported "Baclofen was effective for treating his muscle spasms and pain," he was able to walk four slow laps around the track but "would be extremely fatigued," and he would get "short of breath with exertion"; Dr. Sichel discussed dietary choices and a low-fat diet; and Pulmonology follow-up and a colonoscopy were pending. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶35; see Defs.' App. [D.E. 80-2] at 75–77 (Chronic Care Clinic encounter).

On January 21, 2020, a colonoscopy found "no major pathology that would cause his pain," and the provider recommended a repeat surveillance colonoscopy in five years and that plaintiff "resume his previous diet and medications." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶36; Defs.' App. [D.E. 80-2] at 78 (Jan. 21, 2020, operative report by Mark Dubinski, M.D.).

On February 4, 2020, plaintiff sent an electronic message. Am. Compl. [D.E. 55-2] at 6, ¶21; see Am. Compl. Attach., Ex. K [D.E. 55-3] at 13 (stating: "Dr. Sichel, you is being negligence to my medical needs to see the rheumatologist. . . . I was suppose to get certain test[s] done six months out and was schedule[d] to get vascular and Doppler test[s] done on my blood level in my legs. Since then[, I've] been getting severe cramping in my back in my legs that [is] very painful[, and] also my right kneecap be inflammation[,] causing my right leg to buckle at times[,] and my hand is getting weaker. I explain[ed] this to you at the last visit – you [are] way over due to send me to a rheumatologist and the last visit to the pulmonary was on July 2019. The disease is getting worsen. I need to see these doctors asap [sic]"; in response, "You must request this via sick call.").

17

On February 26, 2020, a Pulmonologist: noted "improved pulmonary function, but that his symptoms were worrisome for possible pulmonary hypertension, and he continued to have significant muscle and joint complaints"; and recommended "an echocardiogram to evaluate for pulmonary hypertension; continued oxygen supplementation with exertion; modifications to some medications; follow up with Rheumatology; and return to Pulmonary clinic in three months." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶37; accord Defs.' App. [D.E. 80-2] at 80.

In March 2020, Butner severely modified its operations due to the COVID-19 pandemic, but plaintiff "continued to receive routine medical care and was evaluated on numerous occasions by his various providers." See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶38.

On March 11, 2020, at sick call, plaintiff complained "of continued bloating after eating, and constipation," and sought a Rheumatologist follow-up. Id. at ¶39. Per the February 2020 Pulmonologist recommendations, Dr. Sichel entered an echocardiogram request to assess for pulmonary hypertension and consultation requests for a Rheumatologist follow up and a return to Pulmonary clinic in three months. Id.; see Defs.' App. [D.E. 80-2] at 83–84 (Mar. 11, 2020, note).

On March 13, 2020, plaintiff's echocardiogram "showed no significant valvular abnormality, no evidence of pulmonary hypertension, and normal left ventricular systolic function." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶40; accord Defs.' App. [D.E. 80-2] at 85.

On March 31, 2020, Dr. Sichel discussed plaintiff's elevated creatine with the Pulmonologist, who "indicated that it would be safe to increase his mycophenolate dosage," and Dr. Sichel did so. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶41; accord Defs.' App. [D.E. 80-2] at 86.

On April 8, 2020, plaintiff had COVID-19 symptoms and low oxygen saturation levels, was transferred to a hospital, tested positive for COVID-19, and was discharged. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶42. Now at Butner: his vital signs were stable, and he was not in apparent

18

distress; his COVID-19 symptoms were monitored daily for 10 days, and his symptoms included a cough, "but his lungs were clear and equal bilateral"; and, by April 10, 2020, he no longer reported shortness of breath, coughing, fever, or chills. Id.; see Defs.' App. [D.E. 80-2] at 87–95.

On April 17, 2020, Dr. Sichel evaluated plaintiff, noted complaints of an occasional cough, but that his breathing was back to normal and cleared him to be removed from the COVID-19 isolation unit. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶43; accord Defs.' App. [D.E. 80-2] at 96–97.

On June 17, 2020, at sick call, plaintiff complained of severe pain in his left neck, radiating to his upper trapezius, and his right knee feeling heavy and unstable when he stood for a prolonged period. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶44. Dr. Sichel: noted good range of motion in his left shoulder, without pain; noted his right knee was stable without effusion or swelling; scheduled him for a follow up in one month, to assess the neck pain; and adjusted his Baclofen and Prednisone dosages. Id.; accord Defs.' App. [D.E. 80-2] at 98–100 (June 17, 2020, sick call note).

On June 23, 2020, plaintiff reported to Dr. Sichel that "he felt his Baclofen dosage was too strong," and Dr. Sichel reduced the dosage. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶45; accord Defs.' App. [D.E. 80-2] at 101 (June 23, 2020, clinical encounter administrative note).

On July 22, 2020, circa 8:21 p.m., plaintiff was evaluated by a paramedic for chest pains and shortness of breath. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶46. Plaintiff "reported coming out of the shower, and getting dizzy and passing out," he had a pulse in the low 40's and a somewhat altered mental status, but "his pulse returned to normal, and he became more alert and awake." Id. The on-call physician was notified, and he was released to his housing unit. Id.; see Defs.' App. [D.E. 80-2] at 102–04 (July 22, 2020, paramedic clinical encounter assessing, "syncopal episode"); Am. Compl. [D.E. 55-2] at 6, ¶22 (describing experiencing "mid-sternal burning pain in his chest while taking a shower" and "having trouble seeing or hearing and [struggling] to breathe").

19

On July 23, 2020, "as follow up to the events of the prior night," Dr. Sichel evaluated plaintiff who "reported experiencing emesis (vomiting) a couple days prior, while having a bowel movement, and that since then, he had been feeling intermittent left chest pain that would last approximately five to ten minutes." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶47. "Due to a concern that he may have experienced a cardiac event manifested by the prior vomiting, Dr. Sichel then sent [plaintiff] out to the emergency room at the local hospital, for evaluation of his reported chest pain and syncope, and to rule out a myocardial infarction (heart attack)." Id.; accord Defs.' App. [D.E. 80-2] at 107–08 (July 23, 2020, clinical encounter). Plaintiff was taken by ambulance to the emergency room at Duke Regional Hospital. See Am. Compl. [D.E. 55-2] at 6, ¶22.

On July 24, 2020, plaintiff had a "stress test," was told he was "suffering from a coronary vasospasm," underwent a cardiac catheterization ("cath"), and was diagnosed with unstable angina and vasospastic angina.[10] See id. at ¶¶22–24; Am. Compl. Attach., Ex. L [D.E. 55-3] at 14–15 (July 24, 2020, Deborah Dawn Smith, NP-C, cardiology consult noting, as "assessment and plan," he "suffered pre-syncopal episode with atypical chest pain at rest which seemed more epigastric in origin who had negative cardiac enzymes, normal rhythm[,] and no further chest pain since admission. He has an abnormal stress test concerning for anterior ischemia. We discussed cardiac cath for definitive diagnosis as well as conservative medical management and he would like to proceed with cath today"); id., Ex. M [D.E. 55-3] at 17–18 (July 24, 2020, Cath left Heart with

---

[10] Compare Am. Compl. [D.E. 55-2] at 7, ¶24 (alleging his vasospasm and unstable angina "could have been avoided if Sichel would have swallowed his ego and deferred to the specialists' recommendations that he himself asked for [sic]"), and Pl.'s Resp. [D.E. 87] at 13–14, ¶¶7–8 (arguing, inter alia: because his "vascular disease wasn't properly tested for progression" due to Dr. Sichel's repeated "denials" of specialist recommendations, his illness "worsened to a degree that he [had] a heart-based emergency and nearly died [sic]"; he "received an emergency heart catheterization because medical intervention was needed to diffuse a 3-blood vessel artery heart vasospasm directly caused by decreased blood flow due to the untreated atherosclerotic plaque build-up in [his] body [sic]"; and "Dr. Sichel is directly responsible for this near-death catastrophe"), with Defs.' App., Sichel Decl. [D.E. 80-1] at ¶99 (declaring: "Contrary to [plaintiff's] claim, obtaining these [vascular] studies would have had no relationship to his admission to the hospital on July 23, 2020, for complaints of chest pain. The cardiac catheterization that was done during that admission showed coronary vasospasm, which is consistent with his previously known Raynaud's syndrome").

coronary angiography by Teresa Brown, M.D., noting, *inter alia*: "all lesions resolved with IC nitroglycerine"; as "recommendations," "To holding in stable condition with TR band in place," "diffuse coronary vasospasm, effectively treated with IC nitroglycerine," "Recommend lifetime Ca++ blocker and long-acting nitrate," and "Start with Procardia XL 60mg daily (or amlodipine) and moderate dose IMDUR"; as "findings," "limited CT through the inferior chest for attenuation correction shows atherosclerotic changes in the thoracic aorta" and "patient appears to have interstitial lung disease as noted on previous CT scan from July 23, 2020 there are also bullous changes"; as "impressions," "1. Probable diaphragmatic attenuation inferior segment; 2. Findings suspicious for mild reversible ischemia anterior segment, 3. Normal wall motion and thickening."); id., Ex. N [D.E. 55-3] at 19 (July 24, 2020, Chest CT noting, *inter alia*: as to findings, "vascular calcifications in the aortic arch and aortic root"); id., Ex. O [D.E. 55-3] at 20–23 (July 24, 2020, Cardiac Cath Report by James Matthew Brennan, M.D., noting a final diagnosis of unstable angina and a primary final diagnosis of vasospastic angina); see also Defs.' App. [D.E. 80-2] at 109–34.

On July 25, 2020, he returned to Butner after "a complete cardiac work up that was negative for a heart attack," and a heart catheterization finding "diffuse coronary vasospasm that caused the chest pain and that was effectively treated with nitrates," and his medications were modified. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶48; see Defs.' App. [D.E. 80-2] at 135–39 (July 25, 2020, Butner medication reconciliation encounter at by C. Duchesne, M.D.).

On September 18, 2020, Dr. Sichel reviewed his chronic care medications and found no changes warranted. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶49; see Defs.' App. [D.E. 80-2] at 140.

On October 7, 2020, at sick call, plaintiff: complained of "pain in his right lower back radiating down to his right ankle"; "requested a walker to sit on, as he was afraid his leg would buckle"; "reported the portable oxygen that he carried was placing increased weigh on his legs";

21

and "complained of dizziness when changing from lying to sitting or standing." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶50. Dr. Sichel: examined plaintiff; expressed a belief that the back pain likely was due to a pinched nerve, but plaintiff did not agree; entered a consultation request for a Physical Therapy evaluation "due to the new onset of right low back pain with lumbar radiculopathy"; and issued a cane pending a Physical Therapy determination if a walker was needed. Id.; accord Defs.' App. [D.E. 80-2] at 141–43 (Oct. 7, 2020, Dr. Sichel sick call encounter).

On October 29, 2020, at an evaluation, he complained of dizziness and feeling tired, and burning in his chest after walking 20 feet. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶51. Dr. Sichel: "noted his low blood pressure may be contributing to his feeling of dizziness, as well as his weight loss and changes in medications following his hospitalization in July"; noted his "chest pain was likely from vasospasm that was diagnosed during the hospitalization"; and "discontinued a medication that may have been causing his low blood pressure." Id.; see Defs.' App. [D.E. 80-2] at 144–45 (Oct. 29, 2020, evaluation encounter with Dr. Sichel).

On November 4, 2020, at a physical therapy evaluation, plaintiff "became argumentative, and spent most of the time complaining about medical and that no one was helping him." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶52. The Physical Therapist observed, inter alia, he "ambulate[d] independently up and down the hill to the medical department three times that day, with no assistive device," "was able to demonstrate good range of motion in his back and lower extremity," "was able to retrieve items off of the floor without any signs of back pain or instability in his right lower extremity," and had "no signs of dizziness upon returning to the upright position from retrieving items off the floor," but "continued to argue that no one knows what he needed and medical was not doing anything for him, and he then refused to continue with the evaluation." Id. The Physical Therapist noted he "did not require a rollating walker," but should use the cane for

22

support, and he did "not have any shortness of breath upon walking up the hill to medical with use of oxygen." Id.; see Defs.' App. [D.E. 80-2] at 146–47 (Nov. 4, 2020, physical therapy evaluation).

On November 18, 2020, at sick call, plaintiff complained of right groin pain and swelling in his lower legs and feet. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶53. Dr. Sichel: noted some swelling in both lower legs and tenderness in the right groin; ordered labs to determine causes of the swelling; and informed plaintiff the groin strain would take time to resolve. Id.; accord Defs.' App. [D.E. 80-2] at 148–49 (Nov. 18, 2020, sick call encounter with Dr. Sichel).

On December 14, 2020, plaintiff "reported continued swelling in his legs, shortness of breath with exertion, and intermittent joint pain." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶54. Dr. Sichel: noted some lower extremity swelling and mild tenderness in his right lower abdomen; noted the Pulmonologist recommended a Prednisone dose reduction, and "his swelling (edema) may be secondary to stopping the diuretic during the last hospitalization"; ordered a new diuretic to address "hypertension and edema"; renewed medications; and entered a Gastroenterologist consult request to evaluate continued constipation complaints and mixed connective tissue disease. Id.; accord Defs.' App. [D.E. 80-2] at 150–53 (Dec. 14, 2020, Chronic Care Clinic encounter).

On January 15, 2021, at a follow-up, plaintiff reported intermittent left arm numbness, right leg numbness, right leg buckling, right hand numbness, and headache. See Defs.' Stmt. Mat. Facts [D.E. 79] at ¶55. Dr. Sichel: examined him; "noted some decreased grip strength on his left hand when compared to his right, and some muscle spasm in his forearm when gripping"; observed "swelling in his lower extremity, and weak bilateral hip flexion but was able to squat and stand on heels and toes"; and restarted blood pressure medication that he had been on prior to his July 2020 hospitalization. Id.; accord Defs.' App. [D.E. 80-2] at 154–56 (Jan. 15, 2021, encounter).

23

On January 29, 2021, plaintiff reported continued intermittent left arm numbness. Defs.'
Stmt. Mat. Facts [D.E. 79] at ¶56. Dr. Sichel noted his grip and arm strength was the same in both
arms and continued blood pressure medication as recent lab work showed dramatically improved
blood pressure. Id.; see Defs.' App. [D.E. 80-2] at 157–58 (Jan. 29, 2021, follow-up encounter).

Circa February 1, 2021, plaintiff sent an electronic message to Dr. Sichel. Am. Compl.
[D.E. 55-2] at 7–8, ¶¶25–26; Am. Compl. Attach., Ex. Q (stating, *inter alia*: on Mar. 9 and July
13, 2018, the Rheumatologist "recommended . . . vascular studies to rule out any arterial disease,"
which Dr. Sichel "discontinued [sic]"; "since then blood vessels worsens and circulated to my
heart [sic]," he was diagnosed with COVID 19 in April 2020 and required cardiac catheterization
in July 2020; since then, he has not seen a rheumatologist but has been "catching severe muscle
cramping in [his] back and legs and arms and causing muscle weakness in [his] right leg"; he
"need[s] to have [an ultrasound] done ASAP on [his] blood vessels because it is out of control";
his "left side feel[s] like a stroke or a funny feeling like that but a Rheumatologist would [know]
what to do for [his] disease"; and he "really need[s] to get the vascular and ultra-sound [tests]
done" because "there [is] a problem with [his] blood vessels" that causes him "fatigue at times");
id., Ex. P [D.E. 55-3] at 24 (Feb. 1, 2024, Dr. Sichel response stating: " As we have discussed[,] I
do not feel vascular studies of your legs will be useful. You have strong pulses in your feet which
indicates good blood supply. Evaluation in the hospital showed spasm of blood vessels in your
heart. You have similar problem in your hands. You are on medications to prevent these spasms.
There may be a similar process effecting blood vessels in your legs. Follow up with the
Rheumatologist has been delayed due to the Covid pandemic but you are on the waiting list.").

On February 25, 2021, at sick call, plaintiff complained of dizziness and right leg muscle
weakness. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶57. Dr. Sichel: "noted weak right hip flexion,

and that his left leg was the stronger of the two"; observed he "had difficulty standing on his toes, but had normal symmetric sensation in his toes"; noted "mild swelling in his lower extremity"; and entered a Neurology evaluation consultation request, "as there was indication that there may be nerve disfunction in his lower right leg which may be causing his symptoms." Id.; accord Defs.' App. [D.E. 80-2] at 159–61 (Feb. 25, 2021, sick call encounter with Dr. Sichel).

On March 31, 2021, Dr. Sichel noted a Rheumatologist could not see plaintiff at Butner and entered a consultation request for an appointment in the community. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶58; Am. Compl. [D.E. 55-2] at 8, ¶27; Defs.' App. [D.E. 80-2] at 162 (admin. note).

On April 30, 2021, at sick call, plaintiff complained of "intermittent throbbing pain in his right groin" and "intermittent twitching and numbness in his left neck," and "stated that he believed he had blockages in his arteries." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶59. Dr. Sichel: noted "some mild swelling in his lower extremity, and no abnormality was noted upon palpation in the area of his right groin where he reported having pain"; explained to plaintiff "there was no evidence indicating he had vascular blockages or blood clots, and that his symptoms were likely from the effect of his chronic conditions affecting his tissues and organ systems"; and "informed him that he did have a consultation pending to see the Rheumatologist, and that they would wait for the recommendations before making any major decisions." Id.; accord Defs.' App. [D.E. 80-2] at 163–64 (Apr. 30, 2021, sick call encounter with Dr. Sichel); id., Sichel Decl. [D.E. 80-1] at ¶63.

On May 13, 2021, plaintiff sent an electronic message. Am. Compl. [D.E. 55-2] at 8, ¶28; see Am. Compl. Attach., Ex. S [D.E. 55-3] at 26 (stating: "Dr. Sichel, I believe I have a blockage Thrombosis deep vein inflammation problem or artery blood blockage circulating from my legs up to my lower intestine then up to may arm then back and to neck. I need to get theses [tests] on this fast. I'm feeling symptoms everyday constantly of fevers neck stiffness, paralysis feeling on

25

the left side of my upper body from neck to arm. I'm feeling a tingling and burning weakness numbness on any activity or motion I do on the upper left body part. I believe the arteries of the arms and legs became narrowed or blocked the way I'm feeling, because I cannot stand on my right leg more [than] 20 minutes, and I am constantly losing feeling in my left arm and hands. Something isn't right I feel something bad is going to happen. Dr. Sichel[,] I need these [tests] to get the surgery help in fixing these arteries to flow again so I don't lose a limb. Also on my left toe I see a dry blood streak in my big toe that['s] been there for a month and not went away. I have ulcers and buttocks all over my legs showing that my blood is clotting or narrowing against the wall. I have a vascular disease of the arteries veins and lymph vessels to blood disorders that affect my circulation. This is a life [threatening] disease no medicine cannot fix this problem [sic]"); id. (Dr. Sichel's response: "I assessed many of these issues when you were seen recently. You can submit another sick call slip if something has changed.").

Circa May 24, 2021, plaintiff sent another electronic message. Am. Compl. [D.E. 55-2] at 8, ¶29; see Am. Compl. Attach., Ex. T [D.E. 55-3] at 27 (stating: "I'm in severe pain between the claudication in my lower legs extremities and upper left side extremities between my neck-arm-back which I'm feeling a spasm tingling and burning and deformity feeling, my right leg constantly is going numbness [sic] every 10 [min.] I stand on it. I believe what's causing this pain it's either [an] arterial blood clot or a deep vein thrombus. I feel sick call after sick call out, this medical administration keeps telling me I'm going to be sent out to see a Rheumatologist since February 31, 2021. Here it is May going into June and nothing [has] been done. [I've] been constantly suffering in pain, and this medical administration here has just stood by and [provided] me with zero medical care in this regard[]. I have a deficient blood problem or deep vein inflammation in my legs that is causing severe problems in the legs and to other areas around my body. This

untreated treatment of my legs[,] extremities now has circulated and attack other areas in my body parts, which has caused me severe harm. This medical administration and Health service department had stood by and watch[ed] this cruel untreatment [sic] medical care take place towards my medical concerns. I need to get those vascular and ultrasound test done immediately. No type of medicine can fix[ ] this problem. I do not want to catch a chest pain again or stroke or heart attack [sic].”); see id. (Inmate Health System response, “You are scheduled for an appointment.”).

On June 10, 2021, Dr. Sichel saw plaintiff for “multiple complaints including dizziness, fatigue, nasal congestion, numbness in the left arm, and pain in legs after walking.” Defs.’ Stmt. Mat. Facts [D.E. 79] at ¶60. His symptoms were unchanged from previous visits, but he “was still convinced he has blockages in his arteries that he needed surgery for, and complained that nothing was being done for him,” and “became loud and angry, speaking to Dr. Sichel in a threatening manner.” Id. “Dr. Sichel asked him to change his tone or leave the office,” before plaintiff left, “Dr. Sichel informed him that his Rheumatology appointment was scheduled for July.” Id.; accord Defs.’ App. [D.E. 80-2] at 165 (June 10, 2021, “canceled Appt/Trip encounter” with Dr. Sichel).

On July 14, 2021, an outside Rheumatologist: found plaintiff did not appear to be in acute distress but “was noted to have right leg swelling”; felt his “symptoms were consistent with vascular claudication” but “there was not a need for further diagnostic testing as he already had the diagnosis”; noted “a referral to vascular surgery could be considered”; and recommended an ultrasound of his lower extremity venous right. Defs.’ Stmt. Mat. Facts [D.E. 79] at ¶61; accord Defs.’ App. [D.E. 80-2] at 166–74 (July 14, 2021, encounter with Andrew Johannemann, M.D.).

On July 16, 2021, plaintiff reported to the Paramedic: “he was having ‘severe vascular claudication’ in his right lower leg, lower intestine, neck and arm”; “he needed to be seen by a ‘vein specialist doctor’ for testing”; and “he needed an MRI of his head, stronger pain medication

and blood pressure medication because his veins and arteries were narrowed." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶62. A sick call appointment was scheduled so that he could be evaluated by the physician. Id.; Defs.' App. [D.E. 80-2] at 175 (July 16, 2021, paramedic clinical encounter).

On August 6, 2021, at sick call: plaintiff complained of dizziness and pain radiating down his right leg when walking; Dr. Sichel noted, "he had no lower extremity edema and no significant varicose veins," "pupils and smile were symmetric, indicating he did not exhibit signs of having had a stroke," but he "did have weak right lower leg flexion at the hip, and was unable to do straight leg raise or stand on his toes"; and Dr. Sichel reviewed the July 14, 2021, Rheumatologist consultation report and "entered an order for an MRI of his spine and pelvis, his lumbar spinal canal, in order to evaluate for suspected right lumbar radiculopathy or spinal stenosis."[11] Defs.' Stmt. Mat. Facts [D.E. 79] at ¶63; see Defs.' App. [D.E. 80-2] at 177–79 (Aug. 6, 2021, encounter).

On August 10, 2021, a Pulmonologist: evaluated plaintiff; noted he "had interstitial lung disease secondary to mixed connective tissue disease versus lupus" and apparent stable symptoms; recommended "a lower extremity doppler study in order to rule out deep vein thrombosis, and a chest x-ray to assess his lung disease"; and requested follow-up. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶64; see Defs.' App. [D.E. 80-2] at 180 (Aug. 10, 2021, Dr. Stephen Tilley consultation report).

On August 16, 2021, Dr. Sichel, inter alia, entered an order for plaintiff to have a skull x-ray followed by an MRI, which "showed chronic multilevel degenerative disk disease, and no

---

[11] Compare Am. Compl. [D.E. 55-2] at 8–9, ¶¶30–31 (alleging: Dr. Johannemann's July 14, 2021, recommendations "marked the fourth opinion by a specialist doctor recommending the same line of medical treatment"; but Dr. Sichel "disregard[ed] a specialist's recommendations"), and Pl.'s Resp. [D.E. 87] at 14–15, ¶9 (arguing, "Dr. Sichel is again provided with he opportunity to conduct appropriate treatment only to maintain his callous stance against it, even in the face of the tragedy that could have taken the Plaintiff's life one year previously [sic]."), with Defs.' App., Sichel Decl. [D.E. 80-1] at ¶¶65, 67 (declaring, inter alia: he reviewed Dr. Johannemann's July 14, 2021, consultation report, which noted "there was not a need for further diagnostic testing [for vascular claudication] as he already had the diagnosis"; "the packet of medical records that [Dr. Sichel] had prepared to have sent with [plaintiff] when he saw the Rheumatologist, did not make it to the specialist"; "At that time, the treatment plan was to have an MRI to evaluate his lumbar spine for nerve entrapment or spinal stenosis"; and, "Additionally[,] he had a Neurology consultation pending, and at the time[,] [Dr. Sichel] did not see an indication warranting venous or arterial Doppler studies.").

central canal stenosis" and noted "severe right L4 foraminal stenosis and moderate L5 foraminal stenosis." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶65; accord Defs.' App. [D.E. 80-2] at 181–82.

On August 25, 2021, at a follow up, plaintiff reported "tingling and burning from left ear to mouth, feeling like he will pass out if he shakes his head, and his concern that he may have an aneurysm in his head [sic]." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶66. Dr. Sichel: examined him, finding his "ear canals were impacted with earwax, his pupils were normal and symmetric, he had mild discomfort in his neck with c-spine range of motion, he did not have carotid bruits, his carotid pulse was difficult to palpate on the right side compared to the left, and he had mild bilateral lower extremity edema"; noted the MRI "indicated right lumbar radiculopathy and severe right L4 foraminal stenosis"; entered a head/neck MRI request "to rule out an aneurism"; "entered consultation requests for him to be seen by the Pulmonologist for the follow up pulmonary function study with spirometry and diffusion and for him to be seen by Neurosurgery for evaluation of his right lumbar radiculopathy"; and "reviewed the Pulmonology consultation report."[12] Id.; see Defs.' App. [D.E. 80-2] at 183–86 (Aug. 25, 2021, encounter).

On August 30, 2021, plaintiff "had an MRI of his brain, and no acute intracranial abnormality was noted." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶67. There was "no evidence of aneurysm with certainty." Id. Plaintiff also had an x-ray of his chest, and no significant change in the appearance of his chest was noted when compared with the film from January 2020. Id.; accord Defs.' App. [D.E. 80-2] at 187 (Aug. 30, 2021, radiologic report by Ripal N. Shah, M.D.).

On September 2, 2021, at sick call, plaintiff complained of left arm pain when he leans on it, tenderness in a vein, right leg pain and instability, and requested crutches instead of a cane.

---

[12] Compare Am. Compl. [D.E. 55-2] at 9, ¶32 (alleging, as to the Aug. 10, 2021, Pulmonologist consultation report, Dr. Sichel "again gave [him] the run-around and left [him] with neither remedy or relief"), with Defs.' App., Sichel Decl. [D.E. 80-1] at ¶70 (declaring, he reviewed Dr. Tilley's Aug. 10, 2021, Pulmonologist consultation report but "did not feel as though ultrasound doppler studies of [plaintiff's] legs would be beneficial or indicated at that time").

Defs.' Stmt. Mat. Facts [D.E. 79] at ¶68. "Upon examination, Dr. Sichel noted he had tenderness over the dorsal aspect of his forearm, and the superficial vein was tender," "noted his left forearm tenderness was likely secondary to mixed connective tissue disease," and issued him crutches. Id.; accord Defs.' App. [D.E. 80-2] at 188 (Sept. 2, 2021, Dr. Sichel sick-call encounter).

On September 21, 2021, plaintiff was seen by a Neurosurgeon, who noted: he was not in acute distress; he had no deformity of his spine or upon examination or tenderness on palpation; he "had decreased sensation in the right side at L4-5 when compared to the right"; he "had decreased patellar reflex on the right when compared to the left," his gait was within normal limits; and an MRI showed a right sided foraminal stenosis most severe at L4-5, and bilateral foraminal stenosis at L5-S1." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶69. "The Neurosurgeon recommended diagnostic/therapeutic spine injections at the L4 and L5 nerve root on the right, and should the injections not help, [plaintiff] could follow up with the specialist in approximately three to six months for further evaluation of the foraminal stenosis." Id.; accord Defs.' App. [D.E. 80-2] at 189–94 (Sept. 21, 2021, neurosurgery consult with Brandon Wayne Smith, MD).

On September 27, 2021, Dr. Sichel: reviewed the September 21, 2021, Neurosurgery evaluation consult report; agreed with the recommended "spinal injections at the right L4-5 nerve root"; and entered a consultation request for plaintiff "to be seen by Pain Management, specifically a Physiatrist, in order to receive the spinal injections." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶70; accord Defs.' App. [D.E. 80-2] at 195 (Sept. 27, 2021, Dr. Sichel chart review).

On October 7, 2021, at sick call, plaintiff: reported continued swelling in right leg and pain; "was convinced that he had a problem in his legs and arms, and he wanted an ultrasound of his legs, as had been recommended by the Rheumatologist"; "reported finding it difficult to walk to the medical clinic" and requested a walker; and stated, "his body was not getting enough oxygen."

30

Defs.' Stmt. Mat. Facts [D.E. 79] at ¶71. On exam, Dr. Sichel "noted he has very mild edema of both legs, strong dorsalis pedis pulses, and was walking without a cane or any other assistive device." Id. To rule out deep vein thrombosis, Dr. Sichel entered an order for a venous ultrasound of his right lower leg. Id. "Dr. Sichel also entered a consultation request for [him] to be evaluated by Physical Therapy based on his new reports of difficulty walking to medical, and his report that the cane and crutches do not help." Id. "Dr. Sichel informed [him] that Dr. Sichel thought it was unlikely that he had a blood clot in his right leg, and that the pain was likely from the pinching of a nerve in his spine." Id.; see Defs.' App. [D.E. 80-2] at 196–97 (Oct. 7, 2021, sick-call encounter).

On October 18, 2021, plaintiff "had a duplex sonography (ultrasound) of the deep veins of his right lower leg. There was no evidence of deep vein thrombosis, and specifically, the common femoral, superficial femoral and popliteal veins showed normal venous flow." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶72; accord Defs.' App. [D.E. 80-2] at 198 (Oct. 18, 2021, radiologic report).

On November 1, 2021, plaintiff "had a pulmonary function test with spirometry, and was noted to have minimal obstructive lung defect, mild restrictive lung defect, and severe decrease in diffusing capacity." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶73; see Defs.' App. [D.E. 80-2] at 199 (Nov. 1, 2021, Spirometry data signed by Dr. Ashish Singh).

On November 16, 2021, Dr. Sichel: saw plaintiff for complaints "of difficulty breathing over the past three hours, a feeling that his upper abdomen was distended, and constipation"; noted his "upper abdomen protruded when he was standing, and when laying supine[,] it was concave," and his "abdomen was very soft and had mild tenderness in the upper abdomen"; and "prescribed a new medication to address his constipation." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶74; accord Defs.' App. [D.E. 80-2] at 200–02 (Nov. 16, 2021, evaluation encounter with Dr. Sichel).

31

On November 19, 2021, at a follow-up visit, plaintiff: "complained of a burning sensation in his stomach after drinking the prescribed magnesium citrate and throwing up, as well as continued complaints of pain in his right lower left leg after standing for a few minutes; "reported burning and tingling in the leg, and reported pain in both legs with walking, symptoms in his left arm, fatigue all day"; and "remained convinced that the issues in his arm and legs were secondary to blockages in his arteries and veins." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶75. On examination, Dr. Sichel: "noted the radial pulse was normal in his arm, and no lower extremity edema"; "ordered several labs to be run"; entered a consultation request for a vascular surgeon evaluation, based upon plaintiff's "continued complaints of pain, burning, tingling and symptoms in both legs and his left arm"; "noted he had strong pulses in his feet and arms, and that the ultrasound of his right upper leg did not show thrombosis"; and, based on the data before him, "did not think that arterial vascular studies were indicated." Id.; accord Defs.' App. [D.E. 80-2] at 203–05 (Nov. 19, 2021, follow-up with Dr. Sichel); see Am. Compl. Attach., Ex. Z [D.E. 55-3] at 35–38 (Nov. 19, 2021, Dr. Sichel inhouse vascular surgery consultation request with Dec. 21, 2021, "target date").

On November 24, 2021, at a Physical Therapist evaluation, plaintiff "noted that his goal for the consultation was to get a walker so that he could rest when having to come to his medical appointments." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶76. The Physical Therapist noted: plaintiff "did not appear to be in any distress or shortness of breath, but he was wearing oxygen via a nasal canula"; "Both lower legs showed hemosiderin staining in the shin area, but there did not appear to be any edema"; he "walked without the use of an assistive device, despite having a cane in his property"; his "bilateral passive range of motion ('PROM') for his trunk and lower extremity was within functional limits"; he "did appear to have pain when attempting to actively raise his right lower leg"; when laying on his back and bringing his knee to his chest the motion was within

32

functional limit, with no signs of pain at the end of range of motion"; he exhibited full PROM in his hip and ankle with no signs of pain at the end of the range"; he "was able to actively lift his bilateral lower extremity independently up onto the bed when asked to lie on his back"; he "was able to transfer independently from supine to sit, and sit to stand"; he "would not attempt to resist the manual over pressure measure with his right lower extremity"; "he had impaired muscle performance, but was highly functioning"; and that he "did not put his full effort into the right lower extremity resistance measures." Id. The Physical Therapist also noted that he "may benefit from the temporary use of a walker until his lumbar injections occur, and the vascular surgeon clears him," and temporarily issued him a 4-wheel walker. Id.; accord Defs.' App. [D.E. 80-2] at 206–07 (Nov. 24, 2021, administrative note by C. Wharton, MPT).

On November 30, 2021, Dr. Sichel responded to plaintiff's electronic message. Am. Compl. [D.E. 55-2] at 9, ¶33; see Am. Compl. Attach., Ex. X [D.E. 55-3] at 33 (reflecting plaintiff's complaint: "Good morning, the bump on the inside of buttocks is getting big again and when I sist down I can feel the bump and pain. Also, the plaque in my leg causing the narrowing and blocked arteries or vein obstruction circulation through my blood flow and cause more damage to my lower legs[,] abdominal aorta, calves, thoughts, arms, neck, head, these areas is making it real hard for me to function every day. Every time I stand on my leg more [than] a few minutes this extreme pain of a tingling burning leg weakness occurred, and when I try to walk the pain get intense, making me start to hop or limp or just fall to the ground. Every day and every moment I be feeling dizziness and fatigue. Now when I be laying down[,] the pain is throbbing. I also feel my left face slurping [sic]. I really need help fast in getting stents in my body where the plaque is causing my blood flow to narrowing or blocked causing these problems [sic]"); id. (with Dr. Sichel's response, "I have you on my schedule for 11/30 at 12:30. I can examine you then.").

Also on November 30, 2021, at a preventive health visit and Chronic Care Clinic, Plaintiff "reported continued shortness of breath with exertion, intermittent dizziness," and "the recently issued walker was helpful." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶77. Dr. Sichel: noted the prescribed Baclofen appeared to be helping with pain, he "was using a rolling walker, and had portable oxygen available but was not using it to walk around the clinic"; observed he "had no lower extremity edema, darker patches on his legs, and no skin lesions on his torso"; and noted he "had a follow up pending with the Pulmonologist, and his mixed connective tissue disease was being treated with an anti-inflammation medication"; and "entered a consultation request for him to follow up with the Pulmonologist, as the November 1, 2021[,] pulmonary function test showed severe decrease in diffusion and mild restriction." Id. "Minor changes were made to two of his prescribed medications," "the remaining were renewed," and he "was started on a medication to lower his cholesterol."[13] Id.; see Defs.' App. [D.E. 80-2] at 208–212 (Nov. 30, 2021, encounter).

On December 9, 2021, plaintiff was seen by the Physiatrist in Pain Management and, after examination and record review, "was found to be a candidate for right-sided transforaminal epidural steroid injections at L4-5 and L5-S1." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶78; see Defs.' App. [D.E. 80-2] at 215–16 (Dec. 9, 2021, consultation report by Hernan Jimenez-Medina, M.D.).

On December 15, 2021, at sick call, plaintiff complained of, *inter alia*, "numbness and tingling in both legs" and his report "he could only stand for about 10 minutes." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶79. Dr. Sichel: noted plaintiff "had mild edema in both lower legs, the left more than the right"; "He was able to feel all 10 points with a monofilament in his feet and was

---

[13] Compare Defs.' App., Sichel Decl. [D.E. 80-1] at ¶81 (declaring, *inter alia*, plaintiff was put on cholesterol lowering medication "in an effort to reduce the risk of clogging of the arteries"), with Pl.'s Resp. [D.E. 87] at 15, ¶10 (arguing that, instead of acquiescing to the Rheumatologist's July 14, 2021, recommendations for lower extremity ultrasound and vascular surgery referral, on November 30, 2021, Dr. Sichel instead took a "half measure" and "[assigned] medication to reduce the risk of another heart attack [sic]," by starting him on medication to reduce cholesterol).

able to identify when each toe was touched"; and he "had weak hip flexion, in the right more than left, and weak flexion/extension of his knees." Id. Dr. Sichel: "ordered a CT scan of his pelvis, to examine a lump in the right buttock that had not resolved with antibiotics"; "reviewed the December 9, 2021[,] Physiatry evaluation, and noted that [plaintiff] previously had been identified as a candidate for epidural steroid injection ("ESI") in the L4-5 and L5-S1"; and "entered a consultation request for him to have an epidural injection for his lumbar radiculopathy." Id.; accord Defs.' App. [D.E. 80-2] at 217–18 (Dec. 15, 2021, sick-call encounter with Dr. Sichel).

On December 21, 2021, plaintiff saw a pulmonologist for complaints "focused on his lower extremity pain and numbness." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶80. The Pulmonologist, *inter alia*: "noted he had a slightly reduced lung function, but was unchanged when the x-ray was compared to prior testing"; "recommended repeat pulmonary function testing with spirometry in May 2022," and follow up after; and "recommended considering a referral to Cardiology given the severity of [his] vasospastic coronary artery disease and ongoing complaints, which may be vascular in nature." Id.; accord Defs.' App. [D.E. 80-2] at 219 (Dec. 21, 2021, Stephen Tilly, M.D. consultation report); see Am. Compl. [D.E. 55-2] at 9, ¶34 (erroneously alleging Dr. Sichel's Nov. 19, 2021, vascular surgery consultation request was "in response" to this Dec. 21, 2021, report).

On January 7, 2022, Dr. Sichel saw plaintiff "for complaints of numbness in both legs, increasing difficulty in walking to the medical clinic, and intermittent severe pain," and reported "weakness in his left arm, with a burning feeling." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶81. "Dr. Sichel noted: "his strength in his upper extremities were symmetrically decreased, with mildly diminished upper extremity reflexes"; "he had consultations pending with Physiatry (pain management) and the vascular surgeon"; and "he had no focal neurologic signs in his upper extremities." Id. Dr. Sichel also "entered a consultation request for him to be evaluated by General

35

Surgery for the lump on his right buttock that did not respond to antibiotics and could be an abscess." Id.; accord Defs.' App. [D.E. 80-2] at 220–21 (Jan. 7, 2022, follow-up with Dr. Sichel).

On January 21, 2022, Dr. Sichel reviewed the December 21, 2021, Pulmonologist report.[14] Defs.' Stmt. Mat. Facts [D.E. 79] at ¶82; accord Defs.' App. [D.E. 80-2] at 222 (chart-review).

On January 28, 2022, plaintiff "was evaluated for surgery on the lump on his right buttock, suspected to be a pilonidal cyst." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶83; accord Defs.' App. [D.E. 80-2] at 223–29 (Jan. 28, 2022, consultation with Sharon Beckman, NP).

On February 4, 2022, plaintiff was seen in the Colorectal surgery clinic, a recommendation was made for excision of the pilonidal cyst on his right buttock, and Dr. Sichel "entered a consultation request for him to be evaluated by General Surgery, for removal of the cyst." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶84; Defs.' App. [D.E. 80-2] at 230 (Feb. 4, 2022, chart-review).

On February 23, 2022, plaintiff was evaluated for "complaints of left forearm swelling for two days, and pain in his entire left arm which had been going on for several years." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶85. The Nurse Practitioner noted his epidural spinal injection was cancelled due to COVID restrictions, and "he was awaiting a consultation with Vascular Surgery for evaluation of symptoms in his arms and legs." Id.; accord Defs.' App. [D.E. 80-2] at 231–32.

On March 9, 2022, plaintiff had follow-up for his left forearm swelling and "reported he now had left calf swelling, which had been going on for years," and the Nurse Practitioner noted spinal injections should occur soon since COVID restrictions were being lifted. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶86; see Defs.' App. [D.E. 80-2] at 233–34 (Mar. 9, 2022, follow-up encounter).

---

[14] Compare Am. Compl. [D.E. 55-2] at 9, ¶34 (alleging this "marked yet another instance where Sichel simply refused to follow specialist recommendations"), and Pl.'s Resp. [D.E. 87] at 16, ¶¶11–12 (arguing Dr. Sichel was "unmoved" by, and "disregarded," the Pulmonologist report), with Defs.' App., Sichel Decl. [D.E. 80-1] at ¶86 (declaring he noted the Pulmonologist's Dec. 21, 2021, recommendations, which he "planned to review" with plaintiff "at the next visit," but since a vascular surgeon referral was pending, "there was not a need for a Cardiology evaluation at that time").

On March 11, 2022, plaintiff at a follow up appointment, the Rheumatologist conducted an examination, reviewed records, and "recommended labs to assess his autoimmune status, underlying muscle disease, and coronary artery disease." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶87; see Defs.' App. [D.E. 80-2] at 235–36 (Mar. 11, 2022, consultation report with Dr. Ajay Ajmani).

On March 17, 2022, plaintiff saw the Physiatrist and "underwent the epidural spinal injections at L4 and L5." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶88; see Defs.' App. [D.E. 80-2] at 237–38 (Mar. 17, 2022, operative report by Hernan Jimenez-Medina, M.D.). Dr. Sichel reviewed this report and entered a request for a follow up appointment. Defs.' Stmt. Mat. Facts [D.E. 79] at ¶89; see Defs.' App. [D.E. 80-2] at 239 (Mar. 31, 2022, Dr. Sichel chart review).

On April 1, 2022: plaintiff had a follow-up for complaints of pain in his arms and legs," and the Nurse Practitioner noted: "left upper extremity was noted to have mild tenderness to palpation, and full range of motion (unchanged from the previous visit)"; "bilateral lower extremity showed some light brown skin discoloration on the lower leg, minimal tenderness to palpation, and full range of motion in the knee, ankle and foot." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶90; see Defs.' App. [D.E. 80-2] at 240–41 (Apr. 1, 2022, encounter).

On April 11, 2022, Dr. Sichel discussed the March 11, 2022, consultation report with the Rheumatologist.[15] Defs.' Stmt. Mat. Facts [D.E. 79] at ¶91; see Defs.' App. [D.E. 80-2] at 242.

On April 13, 2022, Dr. Sichel: "entered a consultation request for [plaintiff] to have the repeat pulmonary function testing with diffusion, as recommended by the Pulmonologist"; and

---

[15] Compare Am. Compl. [D.E. 55-2] at 10, ¶35 (noting the report indicated he had "coronary artery disease, possible atherosclerosis" and marked "more symptoms than previously[,] revealing a deteriorating progression from his first checkup several years before."); and Pl.'s Resp. [D.E. 87] at 16–17, ¶13 (arguing, "instead of adhering to yet another specialist recommendation in which the progression of [his] disease is noted, [Dr.] Sichel doubles down and refuses this final recommendation in favor of immediate testing and treatment"; "Dr. Sichel and the Rheumatologist discussed the results of the prior testing, which showed all levels were normal except for the slightly elevated ANA, that he did not think was very significant"; and both providers "agreed that not all of the tests needed to be repeated at that time.").

"entered a consultation request for [plaintiff] to return to Pain Management, as recommended, six weeks after the spinal injections to assess the effectiveness." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶92; accord Defs.' App. [D.E. 80-2] at 243 (Apr. 13, 2022, Dr. Sichel orders encounter).

On April 29, 2022, Dr. Sichel: "reviewed the procedure notes from [an Apr. 27, 2022,] anorectal exam during which the surgeon noted no abscess or cyst was present"; and entered a consultation request for a return "for a post-op check and suture removal." Defs.' Stmt. Mat. Facts [D.E. 79] at ¶93; accord Defs.' App. [D.E. 80-2] at 244 (Apr. 29, 2022, admin. note).

On September 27, 2022, plaintiff saw Dr. Longo for a vascular surgery consultation. See Am. Comp. Attach., Ex. BB [D.E. 55-3] at 40–41 (Sept. 27, 2022, vascular surgery consultation report with Christopher Longo, M.D., noting, inter alia: as "chief complaint," "plaintiff convinced that he has blockages in his arteries going to his legs"; as to "history of present illness," "The patient presents agitated and argumentative from the start, convinced that he has blockages in his arteries going to his legs. He has numerous disparate complaints, which are confounded by severe lumbar disease. He states he did not get any relief after a lumbar compression. I could not understand absolutely everything he was saying, as he was speaking rapidly and incompletely and became quite agitated at the beginning of the interview"; as to "past medical history," "Rheumatologic disorder with Raynaud's syndrome, hypertension, COPD, dyslipidemia, Stage III chronic renal insufficiency"; as to "medications," "the patient takes a statin and antihypertensive as well as MMF and prednisone for the rheumatologic disorder"; as to "physical examination," "Normal pedal pulses bilaterally with hemosiderin deposition"; as to "assessment/plan," "He has no evidence of clinically significant peripheral artery disease, despite his profound relief [sic], as he has palpable pedal pulses. He does not and should not see any vascular providers in the near future. He certainly has some relatively mild chronic venous insufficiency, as noted by his

38

hemosiderin in each lower extremity, which is cosmetic. He is already in knee-high compression stockings. He does not have clinically significant venous disease. This can be managed by compression therapy."); see also id., Ex. CC [D.E. 55-3] at 42–43 (vascular surgery consultation request: with a 9/29/2022 target date; as "reason for request," "patient missed appointment with in house vascular surgery in June due to a logistics error. Could not see vascular surgery in August as they did not come to the complex as previously planned. Will refer for town trip to outside vascular surgery for symptoms of Raynaud's syndrome"; and, as "original reason for request," Dr. Sichel's Dec. 21, 2021, referral); but see Pl.'s Resp. [D.E. 87] at 17–18, ¶14 (arguing Dr. Sichel "colluded" with, and "coerced," Dr. Longo, "a hand-picked specialist," to produce a finding that plaintiff did not need further testing or treatment for vascular disease).

Legal Standards:

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012). To withstand a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008).

When considering a motion to dismiss, the court need neither accept a complaint's legal conclusions drawn from the facts, see Iqbal, 556 U.S. at 679, nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments," Giarratano, 521 F.3d at 302 (quotation omitted). The court, nevertheless, presumes as true the factual allegations in the complaint and construes these allegations in the light most favorable to the non-moving party. Albright v. Oliver,

39

510 U.S. 266, 268 (1994); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). Further, although the court liberally construes *pro se* filings, see Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978), all complaints must contain "more than labels and conclusions," Twombly, 550 U.S. at 555.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

1) Plaintiff's FTCA claims:

Plaintiff alleges, *inter alia*: the United States, through its employee, Dr. Sichel, had a duty to provide him medical care; the United States, through Dr. Sichel, "breached that duty by knowing [his] condition and the several specialists' recommendations in order to cut costs of medical expenses on behalf of the Federal Bureau of Prisons who have urged its doctors not to spend money

40

on costly life-saving procedures [sic]"; the "United States medical negligence/malpractice [sic],"
through Dr. Sichel, "caused an untreated diagnosis to develop unchecked leading to atherosclerotic
plaque progression which developed in to coronary artery disease and symptoms of PAD due to
atherosclerotic which affected [his] heart with coronary vasospasm injury, unstable angina, and
thoracic aorta aneurisms [sic]"; and "Because of the United States negligence/malpractice"
through Dr. Sichel "ignoring recommended treatments," "they have caused [him] extensive artery
and nerve damage," and "caused [him] to have an easily preventable CATH surgery in his heart,
which also has caused [him] mental and emotional pain and suffering, loss of established way of
life, diminished his physical capabilities, and created conditions that will negatively affect [him]
leading into the future." See Am. Compl. [D.E. 55-2] at 14–15, ¶¶54–58.

"As a general rule, the United States is immune from claims for money damages in civil
suits." Blanco Ayala v. United States, 982 F.3d 209, 214 (4th Cir. 2020) (citing Larson v.
Domestic & Foreign Commerce Corp., 337 U.S. 682, 686–90 (1949)). Pursuant to the FTCA,
however, the United States waives its sovereign immunity for "the negligent or wrongful act or
omission of any employee of the Government while acting within the scope of his office or
employment." 28 U.S.C. § 1346(b)(1); Millbrook v. United States, 569 U.S. 50, 52 (2013); United
States v. Muniz, 374 U.S. 150, 150 (1963) (finding a prisoner "can sue under the [FTCA] to recover
damages from the United States Government for personal injuries sustained during confinement
in a federal prison, by reason of the negligence of a government employee." (footnote omitted)).

The United States, however, may be held liable only to the extent that a "private person []
would be liable to the claimant in accordance with the law of the place where the act or omission
occurred." 28 U.S.C. § 1346(b). North Carolina's state substantive law applies, Pledger v. Lynch,
5 F.4th 511, 518 (4th Cir. 2021) (providing FTCA claim relies on Federal Rules of Civil Procedure

41

while applying the substantive law of the State where the injury occurred); see Iodice v. United States, 289 F.3d 270, 274–75 (4th Cir. 2002), and the Government's liability depends upon the existence of a state cause of action imposing liability, F.D.I.C. v. Meyer, 510 U.S. 471, 477–78 (1994) (explaining state tort law is "the source of substantive liability under the FTCA").

Plaintiff's FTCA claims – generally alleging that Dr. Sichel ignored or delayed requests by specialists for testing and treatment – sound in medical malpractice, not ordinary negligence. See Littlepaige v. United States, 528 F. App'x 289, 293–94 (4th Cir. 2013) (per curiam) (unpublished) (distinguishing between ordinary negligence and medical malpractice under North Carolina law); N.C. Gen. Stat. § 90–21.11(2)(a) (defining a medical malpractice action as "a civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider").

In North Carolina, the elements of medical malpractice are: "(1) the standard of care, (2) breach of the standard of care, (3) proximate causation, and (4) damages." Turner v. Duke Univ., 325 N.C. 152, 162, 381 S.E.2d 706, 712 (1989) (citation omitted).

In support of the motion for summary judgment on plaintiff's FTCA claims, the United States argues, inter alia, that: "plaintiff has not provided an expert opinion stating the standard of care for an injury such as his, or for any matters relating to his purported injuries or any breach of the applicable standard of care which caused him injuries." Mem. [D.E. 76] at 18–19.

"One of the essential elements of a claim for medical negligence is that the defendant breached the applicable standard of medical care owed to the plaintiff." Goins v. Puleo, 350 N.C. 277, 281, 512 S.E.2d 748, 751 (1999). "To meet their burden of proving the applicable standard of care, plaintiffs must satisfy the requirements of N.C.G.S. § 90–21.12." Crocker v. Roethling, 363 N.C. 140, 142, 675 S.E.2d 625, 628 (2009). This statute presently provides, in relevant part:

42

the defendant health care provider shall not be liable for the payment of damages unless the trier of fact finds by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action

N.C. Gen. Stat. § 90-21.12(a).

"Plaintiffs must establish the relevant standard of care through expert testimony." Crocker, 363 N.C. at 142, 675 S.E.2d at 628; see Ballance v. Wentz, 286 N.C. 294, 302, 210 S.E.2d 390, 395 (1974) ("[A]s in all cases involving negligent failure of the surgeon or physician to render professional treatment for diseases or injuries, the plaintiff cannot rely on common knowledge or lay testimony to make out a case for the jury. In cases of diseases or injuries 'with respect to which a layman can have no knowledge at all, the court and the jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.'" (citation omitted)); Smith v. Whitmer, 159 N.C. App. 192, 195, 582 S.E.2d 669, 671–72 (2003) ("Because questions regarding the standard of care for health care professionals ordinarily require highly specialized knowledge, the plaintiff must establish the relevant standard of care through expert testimony . . . . Further, the standard of care must be established by other practitioners in the particular field of practice of the defendant health care provider or by other expert witnesses equally familiar and competent to testify as to that limited field of practice." (citations omitted)); but see Bailey v. Jones, 112 N.C. App. 380, 387, 435 S.E.2d 787, 792 (1993) ("Expert testimony is not required however, to establish the standard of care, failure to comply with the standard of care, or proximate cause, in situations where a jury, based on its common knowledge and experience, is able to decide those issues. The application of this 'common knowledge' exception to the requirement of expert testimony in medical malpractice cases has been reserved for those

43

situations in which a physician's conduct is so grossly negligent or the treatment is of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required, a departure therefrom, or proximate causation." (citations omitted)); Smithers v. Collins, 52 N.C. App. 255, 260, 278 S.E.2d 286, 289 (1981) ("In order for the jury to pass on the reasonableness of a physician's conduct in many medical malpractice cases, however, there is a requirement that expert testimony is needed to establish the standard of care . . . and the proximate cause of the plaintiff's injury . . . . This expert testimony is generally required when the standard of care and proximate cause are matters involving highly specialized knowledge beyond the ken of laymen. It has never been the rule in this State, however, that expert testimony is needed in all medical malpractice cases to establish either the standard of care or proximate cause. Indeed, when the jury, based on its common knowledge and experience, is able to understand and judge the action of a physician or surgeon, expert testimony is not needed." (internal citations omitted)); Makas v. Hillhaven, Inc., 589 F. Supp. 736, 740–41 (M.D.N.C. 1984) ("Expert testimony is not required, however, in all medical malpractice actions. When the jury, based on its common knowledge and experience, can understand, evaluate, and judge the legal reasonableness of a health care provider's actions, expert testimony is not needed." (citations omitted)).

> In his response in opposition, specifically as to his FTCA claims, plaintiff states:
>
> This action was commenced against the United States of America as Defendant pursuant to 28 U.S.C. § 1346 and 2671 and the [FTCA]. Defendant U.S.A. by and through wrongful acts and omissions of her employee, Lawrence Sichel, located at Butner Federal Correctional Institution, P.O. Box 1000, Butner North Carolina, 27509, failed to use reasonable care, allowing a breach of duty by its own agents who were the proximate cause of damages as alleged in the Complaint. See *[Camalier] v. Jeffries*, 340 N.C. 699, 460 S.E.2d 133 (1995); and *Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009).

Pl.'s Resp. [D.E. 87] at 23–24, ¶10.

> The inapposite cases plaintiff cites involve vehicular negligence, not medical malpractice.

44

Plaintiff also cites to his amended complaint, exhibits, his filings in opposition to defendants' earlier motions, and a second set of admissions. Id. at 2, 9–10, 17 (referencing, presumably, [D.E. 36, 37, 37-1, 37-2, 55-2, 55-3, 66, 67]). The court has reviewed these filings.

Plaintiff also attaches a May 31, 2023, letter from Doctor Bernard Ashby, stating, *in toto*:

> Honorable Court, I am writing to inform you that I have been retained as a medical expert witness to testify on behalf of Mr. Michael Jones in his civil suit. As such, I am ready and willing to testify at trial via a virtual platform such as Zoom. I have more than 15 years of experience as a Vascular Cardiologist and am extensively training [sic] to diagnose and treat various cardiovascular conditions. I am able to provide expert medical testimony regarding the negligence of care [sic] Mr. Jones' care has received [sic]. I kindly request an expected date and time for the trial so that I can plan accordingly. Please let me know as soon as possible so that I can make the necessary arrangements. Thank you for your attention to this matter.

Pl.'s Resp. Attach. [D.E. 87-1].

Dr. Ashby's letter is not sworn under penalty of perjury and does not specifically mention Dr. Sichel or address the standard of care. Dr. Ashby's letter also falls well short of the requirements for an expert witness report under Federal Rule of Civil Procedure 26(a)(2)(B) (providing that: the written report must contain, *inter alia*, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them"); see Nottingham v. United States, No. 2:16-CV-03022, 2017 WL 3026926, at *4 (S.D.W. Va. July 17, 2017) ("In disclosing expert testimony during discovery, parties are bound by the requirements of Federal Rule of Civil Procedure 26(a)(2). This procedural rule "provides that, unless a court orders otherwise, when 'the witness is one retained or specially employed to provide expert testimony in the case . . . ,' such disclosures 'must be accompanied by a written report' setting forth the relevant details of the witness's testimony." (citations omitted)).

45

The record also reflects "plaintiff's final witness list." See [D.E. 74-7] at 1 (stating, *inter alia*: Dr. Ashby is called "as an expert witness against the defendants' likely expert testimony concerning [his] current diagnoses of atherosclerosis" and "as a witness to [his] suffering, as well as Dr. Sichel's . . . deviation from the proper standard of care of a patient suffering from atherosclerotic calcifications, which resulted in [his] medical complications (i.e. heart vasospasm, lower extremities, and unstable angina) [sic]."). This document also is not sworn under penalty of perjury and amounts to, at best, plaintiff's own lay recitation of Dr. Ashby's anticipated testimony.

In short, Dr. Ashby's letter and "plaintiff's final witness list" are not competent summary judgment evidence as to the FTCA claim's "standard of care" element. See Fed. R. Civ. P. 56(c).

The court now turns to plaintiff's declarations that Dr. Sichel "breached the standard of care" by failing to order lower extremity vascular studies or ultrasounds, Pl.'s Decl. [D.E. 37] at 7–8, ¶29, and "breached the standard of care applicable and necessary for the treatment of atherosclerotic cardiovascular disease," id. at 12, ¶13, and his arguments as to the standard of care, see, e.g., Pl.'s Resp. [D.E. 87] at 4–19 (arguing, *inter alia*: by failing to follow specialists' requests for further testing, plaintiff's "health could only decline"; defendants' failure to follow specialist recommendations is a cost cutting measure; had vascular studies been conducted, "the full extent of plaintiff's condition could be fully known," but Dr. Sichel "continue[d] to deny that basic standard of care [sic]"; because his "vascular disease wasn't properly tested for progression" due to Dr. Sichel's "denials," in July 2020 his illness "worsened to a degree that he [had] a heart-based emergency and nearly died [sic]"; and Dr. Sichel "refused to follow the recommendations of numerous rheumatologists, pulmonologists, and surgeons for years, nearly costing [plaintiff] his life [sic]"); Pl.'s Mem. [D.E. 36] at 13–15 (arguing, *inter alia*: Dr. Sichel "failed to follow the standard of care to order an imaging study to evaluate and see the arteries in Plaintiff's heart and

46

neck to look for the presence of atherosclerotic plaque"; and "It is a commonly accepted fact amongst the field of medicine, which has been made very clear to me through the specialist I've talked to, that there is no medication to reduce atherosclerosis. Such treatment is provided for atherosclerotic [sic] only when the patient has symptoms of coronary artery disease.").

As reflected in the statement of facts, this case involves complex medical issues, and a jury could not "based on its common knowledge and experience," "understand, evaluate, and judge the legal reasonableness of a health care provider's actions." Cf. Makas, 589 F. Supp. at 740–41; Smithers, 52 N.C. App. at 260, 278 S.E.2d at 289. There is no showing that Dr. Sichel's "conduct was so grossly negligent or the treatment is of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required[.]" Cf. Bailey, 112 N.C. App. at 387, 435 S.E.2d at 792; Sprecher v. Kerr, No. 2:98-CV-32-BO(2), 1999 WL 1940024, at *2 (E.D.N.C. Jan. 13, 1999). Plaintiff's declarations and arguments as to the "standard of care" amount to mere lay opinion unsupported by expert testimony. Cf. Crocker, 363 N.C. at 142, 675 S.E.2d at 628; Ballance, 286 N.C. at 302, 210 S.E.2d at 395; Smith, 159 N.C. App. at 195, 582 S.E.2d at 671–72.

Plaintiff also cannot rely upon the doctrine of *res ipsa loquitur* because, due to the numerous complex medical issues noted above, a layperson's common knowledge is insufficient to understand whether negligence occurred in Dr. Sichel's treatment of plaintiff. See Howie v. Walsh, 168 N.C. App. 694, 698, 609 S.E.2d 249, 252 (2005) (requiring a plaintiff relying on the doctrine of *res ipsa loquitur* be "able to show–without the assistance of expert testimony–that the injury was not of a type typically occurring in absence of some negligence by defendant." (citation omitted)); accord Wood v. United States, 209 F. Supp. 3d 835, 845 (M.D.N.C. 2016) (noting: the doctrine of *res ipsa loquitur* "rarely applies in medical malpractice actions," "due in part to the centrality of expert testimony in most medical malpractice actions"; and "Expert testimony permits

47

the jury to understand issues beyond common knowledge, whereas *res ipsa loquitur* is limited to those situations where the common knowledge of laypersons is sufficient." (citations omitted)).

Viewing the evidence and the inferences drawn therefrom in the light most favorable to plaintiff, <u>Scott</u>, 550 U.S. at 378, the United States has shown the absence of evidence to support plaintiff's FTCA claim as to the "standard of care" element under North Carolina substantive tort law, <u>Celotex</u>, 477 U.S. at 325, but plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," <u>Matsushita</u>, 475 U.S. at 587 (emphasis and quotation omitted), and the United States is entitled to summary judgment, <u>see</u> <u>Celotex</u>, 477 U.S. at 322 ("the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"); <u>accord</u> <u>Reid v. United States</u>, No. 22-CV-1687-SAL, 2024 WL 63869, at *2–5 (D.S.C. Jan. 5, 2024) (granting partial summary judgment on FTCA claim where federal inmate failed to present expert testimony to establish standard of care for medical malpractice under South Carolina substantive tort law); <u>cf.</u> <u>Riddick v. Barber</u>, 109 F.4th 639, 645–46 (4th Cir. 2024) (reversing district court's dismissal of state psychiatric detainee's complaint under 42 U.S.C. § 1983 for failing to "identify the accepted professional standard" for restraints and seclusion in the civil-commitment context); <u>Phoenix v. Amonette</u>, 95 F.4th 852, 858–61 (4th Cir. 2024) (vacating summary judgment grant in state inmate case under § 1983 and finding, *inter alia*, "there is no per se rule that expert testimony is necessary to establish an Eighth Amendment deliberate indifference claim"); <u>Pledger</u>, 5 F.4th at 518 (holding state statutory pre-dispute medical negligence certificate requirement inapplicable for federal-court FTCA claim); <u>Alston v. Locklear</u>, No. 1:19-CV-96, 2022 WL 1137229, at *8 (M.D.N.C. Apr. 18, 2022) (finding issues of fact in prison doctor medical

malpractice case where, *inter alia*, standard of care evidence was provided via an optometrist's testimony "he would have expected a referral to optometry based on the results of [the] eye exam").

2) Plaintiff's Bivens claims against Dr. Sichel:

The court now turns to plaintiff's Bivens claims against Dr. Sichel which, for the following reasons, are precluded by the FTCA judgment bar.

> While waiving sovereign immunity so parties can sue the United States directly for harms caused by its employees, the FTCA made it more difficult to sue the employees themselves by adding a judgment bar provision. That provision states: "The judgment in an action under section 1346(b) of this title shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." § 2676. "[O]nce a plaintiff receives a judgment (favorable or not) in an FTCA suit," the bar is triggered, and "he generally cannot proceed with a suit against an individual employee based on the same underlying facts." The [FTCA] thus opened a new path to relief (suits against the United States) while narrowing the earlier one (suits against employees).

Brownback v. King, 592 U.S. 209, 212–13 (2021) (quoting Simmons v. Himmelreich, 578 U.S. 621, 625 (2016)).

Plaintiff's instant Bivens claims arose out of the "same subject matter" as his FTCA claims against the United States. See 28 U.S.C. § 2676; Unus v. Kane, 565 F.3d 103, 122 (4th Cir. 2009) (finding the FTCA judgment bar "must encompass all of the claims that could have been brought with regard to the conduct at issue against the responsible 'employee of the government.'").

Thus, because the United States is entitled to summary judgment on plaintiff's FTCA claims, plaintiff's Bivens claims against Dr. Sichel must be dismissed, see Unus, 565 F.3d at 122 ("In these proceedings, the plaintiffs chose to pursue their claims against the federal agent defendants through *Bivens* as well as under the FTCA. As such, they risked having a judgment on the FTCA claims operate to bar their *Bivens* theories"), and the court need not reach Dr. Sichel's alternative summary judgment arguments, see Cash v. United States, No. CIV. WDQ-12-0563, 2012 WL 6201123, at *9, n.26 (D. Md. Dec. 11, 2012).

49

Conclusion:

For the reasons discussed above, the court: GRANTS the United States' second motion for summary judgment [D.E. 75]; GRANTS Dr. Sichel's motion to dismiss [D.E. 77] pursuant to the FTCA judgment bar, 28 U.S.C. § 2676; and DIRECTS the clerk to close the case.

SO ORDERED this 23 day of September, 2024.

*Richard E. Myers II*

RICHARD E. MYERS II
Chief United States District Judge